991 A.2d 1275

**STATE of Maryland**

v.

**Mark DENISYUK a/k/a Mikhail Belashov, a/k/a Michael Belashov.**

**No. 1819 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

March 29, 2010.

412

414

Mary Ann Ince (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellant.

Brian L. Zavin (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, GRAEFF and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, JR., Judge (Retired, Specially Assigned).

In a nutshell, the appellee, Mark Denisyuk, entered a plea of guilty but, in the cold light of dawn, was unhappy about having done so. In such a fell clutch of circumstance, two possibilities have potential for turning back the clock. One is to establish that the plea was involuntary. The other, distinct albeit closely intertwined, is to establish that the lawyerly advice, or lack thereof, that precipitated the plea was constitutionally ineffective. The appellee had a go at both possibilities and, to the State's chagrin, prevailed on one of them.

### Procedural Background

The appellee is a native and a citizen of Latvia. On November 2, 2006, he entered a guilty plea in the Circuit Court for Harford County to the charge of second-degree assault. He was found guilty and received a sentence of ten years imprisonment with all but two years suspended followed by three years of supervised probation "upon release."

A year later, on October 15, 2007, however, the appellee petitioned for post-conviction relief. He claimed that prior to entering the plea of guilty, he had not been advised that, as a possible collateral consequence of a conviction, he might be subject to deportation from the United States. He contended

that as a result of that failure to advise, 1) his guilty plea was involuntary and 2) he had been denied his Sixth Amendment right to the effective assistance of counsel. A hearing was held on that petition on May 16, 2008.

The hearing judge, in a Memorandum Opinion and Order filed on August 29, 2008, ruled against the appellee with respect to the voluntariness of the guilty plea. The State, as appellant, has not challenged that ruling. We accept, as established fact, that the appellee's plea of guilty was voluntary. Any discussion of the judge's ruling on that issue is unnecessary, except to the extent that it may have some bearing on the related question of effective assistance of counsel.

On the companion argument, however, the hearing judge agreed with the appellee that, under the Sixth Amendment, the appellee had been denied the effective assistance of counsel. The hearing judge ordered a new trial, and the State took this timely appeal.

## A Sixth Amendment Claim

As our analysis begins, it is important to make sure that we are in the right doctrinal ballpark. In his post-conviction petition and in appellate brief before us, the appellee has raised, expressly and exclusively, a claim of ineffective assistance of counsel pursuant to the Sixth Amendment of the United States Constitution, which provides in pertinent part:

In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense.

In pursuing his argument, moreover, the appellee relies totally on the two Supreme Court cases of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). The only Maryland decision even mentioned by the appellee is *Yoswick v. State*, 347 Md. 228, 700 A.2d 251 (1997), an opinion which, in turn, analyzes the claim before it exclusively in terms of the Sixth Amendment right to

counsel and which relies specifically on the Supreme Court decisions of *Strickland v. Washington* and *Hill v. Lockhart.*

We deliberately identify this exclusive doctrinal context in order to fend off the appellee's almost desperate and unadorned mention, low in Footnote 5 of appellate brief, of Article 21 of the Maryland Declaration of Rights. The passing mention is nothing but a Parthian dart and has nothing to do with this case. We are not about, *sua sponte,* to manufacture some unique Maryland obtrusion on well-settled and smoothly functioning national law.

### An Act, At Most, of Sub–Constitutional Omission

The failure to advise of which the appellee complains was, at most, an act of nonfeasance and not one of misfeasance, an error of omission and not of commission. Since 1999, Maryland Rule of Procedure 4–242(e) has provided:

> (e) *Collateral Consequences of a Plea of Guilty or Nolo Contendere.* Before the court accepts a plea of guilty or nolo contendere, *the court, the State's Attorney, the attorney for the defendant,* or any combination thereof *shall advise* the defendant (1) that by entering the plea, *if the defendant is not a United States citizen, the defendant may face additional consequences of deportation, detention, or ineligibility for citizenship. . . . The omission of advice concerning the collateral consequences of a plea does not itself mandate that the plea be declared invalid.*

(Emphasis supplied).

In this case there was a total omission by everybody to say anything. This distinction between omission and commission may take on importance as we examine the national caselaw. Whereas some of the analyses have recognized the possibility that the affirmative giving of erroneous advice on the collateral consequence of deportation may amount to the ineffectiveness of counsel pursuant to the Sixth Amendment, *see, e.g., United States v. Couto,* 311 F.3d 179 (2d Cir.2002), none has considered the mere omission to say anything at all to be so dire a constitutional breach.

## Round Up the Usual Suspects

As the appellee entered his guilty plea on November 2, 2006, no such advice, as we have said, was given by anyone. The subject of deportation or, indeed, of the appellee's non-citizenship never arose. Rule 4–242(e) was ostensibly ignored. Who, if anyone, dropped the ball? One can picture the trial judge, the prosecuting attorney, and the defense attorney standing in an embarrassed circle, each pointing an accusing finger at one or both of the others. In such a situation, however, it is the defense attorney who unfortunately draws the short straw. The Sixth Amendment, after all, does not guarantee to a criminally accused a right to the effective assistance of the trial judge or a right to the effective assistance of the prosecuting attorney. The sweeping command to all hands by Rule 4–242(e) notwithstanding, the Sixth Amendment puts the defense attorney, all by himself, on the constitutional hot seat.

## The Two–Pronged Test of *Strickland*

The acid test for assessing the effective assistance of defense counsel was articulated by the Supreme Court in 1984 in *Strickland v. Washington.* It is a two-pronged test that appraises, in either order, 1) performance and 2) prejudice. Justice O'Connor's opinion for the Court discussed the double-barreled thrust of the test.

> *A convicted defendant's claim* that counsel's assistance was so defective as to require reversal of a conviction or death sentence *has two components.* First, *the defendant must show that counsel's performance was deficient.* This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, *the defendant must show that the deficient performance prejudiced the defense.* This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Unless a defendant makes both showings, it cannot be said that the conviction* or death

sentence *resulted from a breakdown in the adversary process that renders the result unreliable.*

466 U.S. at 687, 104 S.Ct. 2052 (emphasis supplied).

### *Strickland's* Performance Prong

 It is the first of the two prongs—the performance prong—that will command our almost exclusive attention in this case. *Strickland* went as far as it is reasonably feasible to go, 466 U.S. at 687–88, 104 S.Ct. 2052, in constructing a workable standard of lawyerly effectiveness.

As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of *reasonably effective assistance.* The Court indirectly recognized as much when it stated in *McMann v. Richardson* that a guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not *"a reasonably competent attorney"* and the advice was not *"within the range of competence demanded of attorneys in criminal cases."* When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

*. . . The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.*

(Emphasis supplied).

 *Strickland* wisely admonished, 466 U.S. at 688–89, 104 S.Ct. 2052, that there are no objective absolutes or mathematical formulae for measuring performance.

These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney performance. In any case presenting an ineffectiveness claim, *the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.* . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the

range of legitimate decisions regarding how best to represent a criminal defendant.

(Emphasis supplied).

 The Supreme Court did, however, emphatically stress that the effective assistance of counsel is not something to be second-guessed in hindsight on the basis of what worked and what did not.

*Judicial scrutiny* of counsel's performance *must be highly deferential. It is all too tempting* for a defendant *to secondguess counsel's assistance after conviction* or adverse sentence, and *it is all too easy for a court,* examining counsel's defense after it has proved unsuccessful, *to conclude that a particular act or omission* of counsel *was unreasonable.* A fair assessment of attorney performance requires that every effort be made to *eliminate the distorting effects of hindsight,* to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, *a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;* that is, *the defendant must overcome the presumption* that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689, 104 S.Ct. 2052 (emphasis supplied).

We will be applying, *infra,* this prong of the *Strickland* test to the performance of defense counsel at the appellee's 2006 guilty plea.

### *Strickland's* Prejudice Prong

 To establish ultimate ineffectiveness, however, a showing of lawyerly error is never enough. A defendant must also establish how he was actually prejudiced by the error. With respect to the element of prejudice, the burden of proof is most unequivocally allocated to the defendant.

[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to *a general requirement that*

*the defendant affirmatively prove prejudice. . . .* Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. . . . Even if a defendant shows that particular errors of counsel were unreasonable, therefore, *the defendant must show that they actually had an adverse effect on the defense.*

466 U.S. at 693, 104 S.Ct. 2052 (emphasis supplied).

*Strickland's* pronouncements with respect to the prejudice prong were made in contemplation of a trial that proceeds to a verdict on the merits. They are, therefore, not tidily apposite to the plea bargain situation being addressed in this case. They nonetheless convey the notion that the adverse impact of an error must have some likely critical significance and be of more than speculative or trivial import.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. *Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.* Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have an isolated, trivial effect. Moreover, *a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.* Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, *a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.*

466 U.S. at 695–96, 104 S.Ct. 2052 (emphasis supplied).

The defendant must show that, but for the error, the result would probably have been different.

*The defendant must show that there is a reasonable probability that,* but for counsel's unprofessional errors, *the result*

*of the proceeding would have been different.* A reasonable probability is a probability sufficient to undermine confidence in the outcome.

466 U.S. at 694, 104 S.Ct. 2052 (emphasis supplied). *See also Bowers v. State,* 320 Md. 416, 425, 578 A.2d 734 (1990).

For evaluating the prejudice prong in the context of the proffering of a guilty plea, it was *Hill v. Lockhart* that then provided a helpful supplement to *Strickland v. Washington.* For starters, it made explicit what had theretofore been only implicit, to wit, that *Strickland's* two-pronged test applied to the taking of a guilty plea as surely as it did to the conduct of the trial itself.

[T]he two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel.

474 U.S. at 58, 106 S.Ct. 366.

Most significantly for the guilty plea context, *Hill v. Lockhart* announced the standard for measuring prejudice.

The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, *in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.*

474 U.S. at 59, 106 S.Ct. 366 (emphasis supplied).

*Hill v. Lockhart* used that standard for measuring prejudice to hold that the petitioner in that case had failed to present even a *prima facie* case of prejudice because he had failed to allege that he would not have entered a guilty plea if his attorney had given him proper advice.

We find it unnecessary to determine whether there may be circumstances under which erroneous advice by counsel as to parole eligibility may be deemed constitutionally ineffective assistance of counsel, because in the present case we conclude that *petitioner's allegations are insufficient to*

*satisfy the Strickland v. Washington requirement of "prejudice." Petitioner did not allege in his habeas petition that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not guilty and insisted on going to trial.*

474 U.S. at 60, 106 S.Ct. 366 (emphasis supplied).

The appellee in this case did not fail to satisfy the prejudice prong, at least in that respect. The appellee was unable to be present at his post-conviction hearing because of his imprisonment in a federal facility. His affidavit, however, was received in evidence, and the hearing judge accepted as a matter of fact the appellee's averment that, had he known about the possibility of deportation, he would never have pleaded guilty. The hearing judge found:

Petitioner has also satisfied the second prong of his ineffective assistance of counsel claim. *Petitioner suffered prejudice because but for trial counsel's conduct he would not have pled guilty and would have proceeded to trial.* Petitioner contends that "Had I been aware of the aforementioned immigration consequences I now face, including an order o[f] deportation, I never would have proceeded in the manner that I did, rather I would have exercised my right to a court or jury trial and any other right or defense which would have prevented the entry of a conviction for a deportable offense."

(Emphasis supplied).

Because the appellee had no realistic chance of prevailing at a trial on the merits [1] and would, upon conviction,

---

1. Both of two brothers whose residence the appellee broke into at 3 A.M. on April 23, 2006, who then fought with him and ejected him, were ready to make in-court identifications. The officer who responded almost immediately to the scene found the appellee in the front yard of the residence in the presence of his victims, with a bloody shirt, blood on his face, smelling of alcohol and with slurred speech. There was no realistic defense. Whatever collateral consequences followed the guilty plea would also have followed the inevitable conviction following a trial on the merits.

have been facing a more severe sentence[2] and the same collateral consequence of deportation in any event,[3] we would probably have been highly skeptical about such a *pro forma*

---

*Yoswick v. State*, 347 Md. 228, 247, 700 A.2d 251 (1997), pointed out that the strength of the State's case is a big factor in deciding whether a defendant would really have gone to trial had he actually received the advice he claimed he was entitled to.

> *The potential strength of the State's case is also relevant in determining whether a defendant would have insisted on going to trial.* Yoswick's trial counsel recognized that the evidence in the case *against Yoswick was overwhelming. The victim,* Storch, *was alive and available to testify* against Yoswick. *Two other witnesses saw Yoswick* drive to a landfill to dispose of bags containing some of Storch's personal belongings, and those witnesses could either identify Yoswick or at least describe the car he drove.... In short, *the case against Yoswick was . . . "overwhelming."*

(Emphasis supplied).

As the Circuit Court of Appeals for the District of Columbia noted in *United States v. Del Rosario,* 902 F.2d 55, 58 (D.C.Cir.1990), "[T]he Supreme Court in *Hill [v. Lockhart]* described 'the resolution of the prejudice inquiry' as closely related to the objective prediction of whether the defense could succeed if the case went to trial."

In this case, however, we are bound by the hearing judge's nonclearly erroneous finding that the appellee would, indeed, have gone to trial.

2. The appellee who could have received a sentence of ten years had eight of those years suspended. In assessing the credibility of the defendant there as he claimed that he would have gone to trial, the *Yoswick* opinion observed, 347 Md. at 247, 700 A.2d 251:

> Petitioner's guilty plea resulted in a sentence significantly shorter than the maximum, and the possibility of facing additional charges in other counties was eliminated. The record does not reflect any reluctance on Petitioner's part to plead guilty and he clearly received the benefit of his bargain.

*Tollett v. Henderson,* 411 U.S. 258, 268, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), also noted in this regard:

> A prospect of plea bargaining, the expectation or hope of a lesser sentence, or the convincing nature of the evidence against the accused are considerations that might well suggest the advisability of a guilty plea.

These observations are beside the point, however, for assessing the credibility of the appellee's claim is not our prerogative.

3. It is the appellee's conviction itself that has subjected him to the risk of deportation. That risk would be there for a conviction following a trial on the merits as surely as for a conviction following a guilty plea. It is hard to see what the appellee would have had to gain by insisting on a trial. That, however, is not our call.

representation, even if uncontroverted, were the matter before us. That is not, however, our prerogative. We were not fact finders, and we have no choice but to accept the facts as properly found by the fact-finding judge.

Before turning away from the prejudice prong, however, a clarification of our position is appropriate. The appellee, at this point in our analysis, is still alive with respect to the prejudice prong, but he has not necessarily prevailed with respect to that prong. For a defendant to decide to enter a guilty plea because of some lack of advice from his attorney does not, *ipso facto*, establish constitutional "prejudice" within the contemplation of *Strickland v. Washington* and the Sixth Amendment. To be the effective catalyst for that degree of prejudice, the failure of lawyerly advice must itself rise to the level of ineffective assistance within the contemplation of *Strickland v. Washington* and the Sixth Amendment. Trivial advisory nonfeasance will not suffice as a cognizable catalyst. It is now appropriate, therefore, to turn to a consideration of the performance prong.

### The Post–Conviction Ruling As to the Performance Prong

It was with respect to *Strickland's* performance prong that the post-conviction court ruled in the appellee's favor. There is no question that the court used as its controlling standard the Sixth Amendment right to the assistance of counsel as interpreted by *Strickland v. Washington.*

*Petitioner contends* that his defense attorney had an obligation to inform him of the potential deportation consequences of his guilty plea and *that his failure to do so constitutes ineffective assistance of counsel under the Strickland and Hill standards.* To establish an ineffective assistance claim, Petitioner must show that: 1) counsel's performance was deficient, in light of all circumstances, to the extent that it exceeded the wide range of professionally competent assistance, and 2) counsel's deficiency caused prejudice. *Strickland v. Washington,* 466 U.S. 468 [668],

694[, 104 S.Ct. 2052, 80 L.Ed.2d 674] (1984).... The Court must give a great deal of discretion to counsel's performance because there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy.' " *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

(Emphasis supplied).

After ruling resoundingly, completely in line with the prevailing national caselaw, that the guilty plea in this case was, indeed, voluntary and valid, the court clearly was struggling to reach a different result on the assistance of counsel claim. Three pages of the eight-page Memorandum Opinion and Order were devoted to its consideration of the performance prong. Ironically, the first two-thirds of that consideration tilted strongly in favor of an opposite conclusion, as the Memorandum Opinion referred to the solid ranks of precedent holding against a finding of ineffective assistance.

>*Petitioner contends that his trial counsel was ineffective because he failed to advise him of the potential deportation consequences of his plea.* Although Maryland courts have not addressed this issue, the *Fourth Circuit rejected this argument because trial counsel does not have a spontaneous duty to inform his client that a guilty plea may lead to deportation. U.S. v. Yearwood,* 863 F.2d 6 (4th Cir.1988). The Court opined, "to hold otherwise would place the unreasonable burden on defense counsel to ascertain and advise of the collateral consequences of a guilty plea which *courts have uniformly held is not ineffective assistance of counsel." Id.* at 8. Accordingly, defense counsel's performance was competent and the Defendant's claim was denied.

>*Courts in other jurisdictions have analyzed ineffective assistance of counsel claims by distinguishing between collateral and direct consequences of a guilty plea. U.S. v. Campbell,* 778 F.2d 764, 768 (11th Cir.1985), *U.S. v. Gavilan,* 761 F.2d 226, 228 (5th Cir.1985), *U.S. v. Santelises,* 509 F.2d 703, 704 (2nd Cir.1975). Courts distinguish between

collateral and direct consequences of a plea to determine if counsel's advice fell within the general bounds of reasonable competence. *State v. Zarate,* 264 Neb. 690[, 651 N.W.2d 215 (2002)] *quoting McMann v. Richardson,* 397 U.S. 759[, 90 S.Ct. 1441, 25 L.Ed.2d 763] (1970). *Courts that apply this analysis have held that deportation is a collateral consequence and therefore a defense attorney's failure to advise of those consequences does not constitute ineffective assistance of counsel.*

(Emphasis supplied).

The Memorandum Opinion then distinguished the two state cases relied on by the appellee, making the critical distinction we have already discussed between the misfeasance of giving erroneous advice and the mere nonfeasance of saying nothing at all.

In support of his claim, Petitioner cites *People v. Soriano* and *People v. Pozo,* 194 Cal.App.3d 1470[, 240 Cal.Rptr. 328] (1987); 746 P.2d 523 ([Colo.]1987). *In both cases, trial counsel affirmatively misled their clients regarding the immigration consequences of their pleas* and failed to investigate immigration law when their clients raised the issue.

(Emphasis supplied).

It was at that point in the Memorandum Opinion that it suddenly shifted gears and turned, almost summarily, in another direction, as the court, seemingly reluctantly, ruled:

*In Maryland, Md. Rule 4-242(e) imposes an affirmative duty upon defense counsel to advise his client of the potential deportation consequences of his plea.* Although *generally courts have found deportation to be a collateral consequence of a guilty plea and therefore the failure to advise of the consequences is not ineffective assistance of counsel,* Md. Rule 4-242(e) specifically requires defense counsel, among others, to advise the defendant that deportation, detention, or ineligibility for citizenship may occur as a result of the guilty plea. *Defense counsel's failure to satisfy the duty imposed by Md. Rule 4-242(e) is deficient performance and outside the reasonable bounds of compe-*

*tence in that he failed to comply with the mandate of the rule.*

(Emphasis supplied).

**Maryland Rule 4–242(e) Is Not a Constitutional Mandate**

 There was no discussion of how a failure to satisfy Rule 4–242(e) would be tantamount to a failure to satisfy the Sixth Amendment. The Sixth Amendment guarantee, in the context of entering a guilty plea, is to ensure that the criminal defendant has been given effective advisory assistance so that the plea will be constitutionally valid, as the hearing judge in this case ruled it to have been. The Sixth Amendment, on the other hand, does not guarantee life-counseling advice, however important such might be to the client, at a sub-constitutional level. A local administration rule, such as Maryland Rule 4–242(e), cannot, of course, expand or contract the coverage of the Sixth Amendment and we are dealing, we would remind the appellee, with a Sixth Amendment issue. *Tollett v. Henderson,* 411 U.S. 258, 266–67, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), makes it very clear that the advice that must be constitutionally "effective" is advice as to constitutional matters. Sub-constitutional concerns are, by definition, not constitutional.

> If a prisoner pleads guilty on the advice of counsel, he must demonstrate that the advice was not "within the range of competence demanded of attorneys in criminal cases." Counsel's failure to evaluate properly *facts giving rise to a constitutional claim,* or his failure properly to inform himself of *facts that would have shown the existence of a constitutional claim,* might in particular fact situations meet this standard of proof.

(Emphasis supplied).

The Seventh Circuit made this distinction between a constitutional issue and a sub-constitutional issue very forcefully in *Santos v. Kolb,* 880 F.2d at 944–45:

> *The issue is not whether defense counsel erred* in not discussing deportation, *but whether his error amounted to a*

*constitutional violation . . . . The failure* of petitioner's counsel to inform him of the immigration consequences of his guilty plea, *however unfortunate it might be, simply does not deprive petitioner of the effective assistance of counsel guaranteed by the Constitution.*

(Emphasis supplied).

### Effective Assistance of Counsel Is Not Omniscient Assistance

There is another aspect of the performance prong that no one has even alluded to, including the parties in their appellate briefs. There are a hundred possible collateral consequences of a guilty plea. Unless an attorney is absolutely bound, in a vacuum, to advise a client as to each and every one of them, there must be some factual compulsion as well as some legal compulsion to pick one out for special advisory comment. Why, as a matter of fact, was the appellee's attorney in this case under any obligation to talk to his client about deportation?

Attorneys are not omniscient, and a reasonable performance "under prevailing professional norms" does not demand omniscience. Notwithstanding the directive of Rule 4–242(e), no advice with respect to the possible collateral consequence of deportation was given when the appellee entered his guilty plea on November 2, 2006. Was that a lapse on the part of the trial judge or the Assistant State's Attorney or the lawyer for the appellee? As a matter of fact, it may well not have been. Every defendant, including the local president of the D.A.R., does not have to be advised about the possibility of deportation. There must be something to alert the parties to the possible pertinence of such a relatively esoteric legal provision before the duty to advise with respect to that provision kicks into gear.

Who, if anyone, knew that the 31–year–old defendant, who had been in the United States since he was 14 years of age, was a non-citizen? Indeed, there was nothing before the trial judge who took the guilty plea or before the post-conviction

hearing to indicate that the trial judge, the prosecuting attorney, or the defense attorney had any reason to suspect that the appellee was a non-citizen. Upon the taking of the plea, a lengthy colloquy between the trial judge and the appellee took place in fluent and colloquial English. In the affidavit the appellee submitted to the post-conviction hearing, there was no mention of defense counsel's having had any awareness of the appellee's citizenship status. Defense counsel, moreover, was not called as a witness at the post-conviction hearing. What this Court observed in *Daley v. State*, 61 Md.App. 486, 490, 487 A.2d 320 (1985), is equally pertinent here:

> *The factual predicate necessary to succeed* on this claim—namely, *that his lawyer knew or should have know that he was an alien—is absent. Petitioner* testified that although he never told his attorney that he was an alien, he nevertheless *expected his attorney to figure out that he was an alien just from hearing his foreign accent. Since the attorney was not called to testify, what the attorney knew or should have known would be mere speculation.*

(Emphasis supplied).

The concurring opinion of Justice White in *Hill v. Lockhart*, joined by Justice Stevens, reached the same decision as did the majority but on the ground that an attorney's performance cannot be deemed ineffective because the attorney failed to advise the client with respect to a matter that the attorney himself knew nothing about.

> [T]here is no allegation that petitioner told his attorney about his previous Florida felony conviction. Indeed, it is incredible that the attorney would have filled in the "0" had he known there was a prior conviction. *Petitioner thus has no factual basis for suggesting that his attorney's advice was incompetent.... Without an allegation that the attorney knew of petitioner's prior conviction, but failed to inform him of the applicability of the Arkansas "second offender" statute, there is no reason to provide petitioner with an evidentiary hearing on his claim of ineffective assistance of counsel.* None of his allegations, if proved, would entitle petitioner to relief, as *there is nothing in the*

*record to indicate "that [defense] counsel's representation fell below an objective standard of reasonableness."*

474 U.S. at 61–62, 106 S.Ct. 366 (concurring opinion of White, J.) (emphasis supplied).

The appellee offered no evidence that his lawyer was aware of his citizenship status. That, however, is just one of several reasons why we hold that defense counsel was not ineffective within the contemplation of *Strickland.*

### The Symbiosis of a Voluntary Plea And the Effective Assistance of Counsel

 The King Solomon-like decision of ruling against the appellee on the voluntariness of the plea but in favor of the appellee on ineffectiveness of counsel is both perplexing and paradoxical. The close relationship between the voluntariness of a plea and the effectiveness of the advice producing the plea is so symbiotic that it is impossible analytically to separate the one from the other. Although there might readily be guilty pleas that are involuntary for reasons other than because of inadequate advice from counsel, the reverse is hard to hypothesize. If the advice given with respect to a guilty plea is so ineffective as to lead to the granting of a new trial, one cannot imagine why the resulting guilty plea would not thereby necessarily have been involuntary. A voluntary plea is not simply a plea that is non-coerced. It is also a plea that must be knowledgeable. *McMann v. Richardson,* 397 U.S. 759, 770–71, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Yoswick v. State,* 347 Md. 228, 239, 700 A.2d 251 (1997) ("To be valid, a plea of guilty must be made voluntarily and intelligently."); *State v. Priet,* 289 Md. 267, 275, 424 A.2d 349 (1981) ("[T]he decisions of this Court have always required that a guilty plea, to be valid, must be entered voluntarily and intelligently."); *Parker v. State,* 160 Md.App. 672, 686, 866 A.2d 885 (2005) ("[A] guilty plea must be knowing and intelligent, i.e., it is subject to the *Johnson v. Zerbst* standard.").

Ineffective advice as to material constitutional matters would necessarily undermine the knowledgeability of a plea. In a case such as this, therefore, the appellee's two contentions at the post-conviction hearing would seem ineluctably to rise or fall together. If the required advice were ineffective, the resulting plea would not be knowing and intelligent and would, therefore, be invalid. If, on the other hand, the plea were valid, the necessary antecedent advice would have been demonstrably effective. "The proof of the pudding...."

Our feeling that there is an indivisible identity between the voluntariness of the guilty plea and the effectiveness of counsel in advising with respect to the guilty plea is reinforced by the United States Court of Appeals for the Seventh Circuit in *Santos v. Kolb,* 880 F.2d 941, 944 (7th Cir.1989):

> [T]he key to whether defense counsel has failed to provide *effective assistance is whether his shortcomings resulted in an involuntary or unintelligent plea.*

(Emphasis supplied).

The Court of Appeals for the Eleventh Circuit confirmed the same identity of issues in *United States v. Campbell,* 778 F.2d 764, 768 (11th Cir.1985):

> [A] defendant's *lack of knowledge of those collateral consequences cannot affect the voluntariness of the plea. Accordingly, counsel's failure to advise the defendant of the collateral consequences* of a guilty plea *cannot rise to the level of constitutionally ineffective assistance.*

(Emphasis supplied). *See also United States v. Couto,* 311 F.3d 179, 187 (2d Cir.2002).

We are so persuaded by the sound reasoning of the hearing judge as to why the guilty plea in this case was, in fact, knowing and voluntary that the logic supporting that ruling inevitably spills over into the intertwined consideration of the effective assistance of counsel. It is hard to conclude that the quality of the advice that produced a voluntary and knowledgeable plea was not, *ipso facto,* effective. At the very least, it was not so lacking as to be "ineffective."

The post-conviction judge squarely rejected the appellee's argument that the failure to advise about the probability of deportation somehow negated the voluntariness of the guilty plea.

> *State v. Daley [Daley v. State] directly contradicts Petitioner's argument.* 61 Md.App. 486[, 487 A.2d 320]. In *Daley,* the petitioner's *deportation proceedings were a collateral consequence of his guilty plea....*

Although *Daley* factually differs from the matter sub judice, it is based on *Michel v. U.S.* and *Nunez Cordero v. U.S.,* two factually similar cases from other jurisdictions. In *Michel,* the *defendant's plea was voluntary and valid even though he did not know about the potential immigration consequences.* 507 F.2d 461, 466 (2nd Cir.1974). The Second Circuit stated, "We do not think that the distinction between a direct and a collateral consequence depends upon the degree of certainty with which the sanction will be visited upon the defendant." A court is only obligated to assume itself that the punishment that it is issuing is understood. *Because deportation is a collateral consequence of a plea, the court's failure to advise the Defendant of this possibility did not invalidate his plea.* Similarly, in *Nunez Cordero,* deportation proceedings were not the type of collateral consequence that could invalidate a plea. 533 F.2d 723, 726 (1st Cir.1976). *"While deportation may have a serious effect on a defendant's life, we are not disposed to treat deportation differently from all other consequences* of conviction of which a defendant may learn." *Although these cases do not bind Maryland courts, the Court of Special Appeals relied on them in Daley.*

(Emphasis supplied).

As we shall discuss *infra,* the hearing judge also properly categorized deportation as a collateral consequence of a conviction and drew the critical distinction between direct and collateral consequences.

> *Although the trial court is obligated to advise Petitioner of the deportation consequences of his plea, its failure to do*

*so does not invalidate the plea.* Under Maryland Rule 5–242(e), the Court shall inform the Defendant of the immigration consequences of his plea. "Shall," indicates that the instruction is mandatory. However, *the committee note states that this rule does not overrule Daley and Yoswick, a case in which the Court determined that parole eligibility is a collateral consequence.* 347 Md. 228[, 700 A.2d 251] (1997). *The court does not have this obligation because deportation is not a direct consequence of the plea,* but rather it is a separate obligation imposed by this rule.

(Emphasis supplied).

The conclusion of the post-conviction court was that knowledge or ignorance as to collateral consequences does not affect the voluntariness of a plea. We find it hard to conceive that the same reasoning would not apply with equal force to the adequacy of the advice that leads to the plea.

Furthermore, *Daley and its predecessors are applicable* to the matter *sub judice because deportation is a civil proceeding.* Deportation is a collateral consequence because it is a civil proceeding administered by another agency, upon which the trial judge has no control. *Daley, quoting Michel,* 407 [507] F.2d at 465. Therefore, deportation cannot impact the range of criminal punishment; rather the conviction invokes a new, civil-based form of punishment. As the State argues, deportation is not within the criminal trial court's authority. Therefore it does not impact the range of his punishment and consequently cannot be a direct consequence of the conviction. Accordingly, *the trial court's failure to advise Petitioner of potential deportation does not invalidate the plea.* Petitioner's post conviction relief on this basis is hereby denied.

(Emphasis supplied).

We will not go so far as to hold, however, that the hearing judge's ruling on one of the appellee's related contentions, no matter how eminently correct we believe that ruling to have been, can operate as a collateral estoppel on the appellee's other contention In purely mechanical terms, the appellee

might, had he taken a cross-appeal, have turned this argument based on consistency around and used it to attack the ruling as to the voluntariness of the guilty plea. The ruling as to ineffective assistance will have to rise or fall on its own merits.

Although the post-conviction hearing ruling that the guilty plea was voluntary and valid will not in and of itself help the State's cause as to effectiveness of counsel, the law that produced that ruling may be dispositively helpful. That the hearing judge ruled the plea to be voluntary is beside the point. If this Court, on the other hand, based upon our independent understanding of the law 1) believes that the plea was knowing and voluntary, which we do; and 2) believes the issue of plea voluntariness and effectiveness of counsel are indivisibly intertwined, which we also do, then it follows syllogistically from our independent conclusion as to plea voluntariness that the assistance of counsel in advising as to that plea could not have been ineffective in a Sixth Amendment sense.

Major Premise: A (voluntariness of plea) is constitutional.

Minor Premise: B (effectiveness of counsel) equals A.

Conclusion: Therefore, B is constitutional.

There are, moreover, in addition to this syllogistic reason and in addition to the factual reason discussed *supra,* additional reasons why the State's appeal must prevail.

### Deportation Is a Collateral Consequence

 The possibility that a non-citizen might be deported from the United States as a result of a criminal conviction is clearly categorized as a "collateral" consequence of conviction and not as a "direct" consequence. In *Daley v. State,* 61 Md.App. 486, 489–90, 487 A.2d 320 (1985), this Court held squarely:

Applying the *Cuthrell [v. Director, Patuxent Institution,* 475 F.2d 1364 (4th Cir.1973) ] criteria to the present case, it is abundantly clear that *Petitioner's possible deportation is merely collateral to his guilty plea.* First, *the consequence of deportation arises from a separate civil proceeding.*

Whereas Petitioner's guilty plea was entered in state criminal court, deportation is adjudicated in federal civil court.

(Emphasis supplied). *See also Cordero v. United States*, 533 F.2d 723, 726 (1st Cir.1976) ("We are not disposed to treat deportation differently from all of the other collateral consequences."); *Michel v. United States*, 507 F.2d 461, 465 (2d Cir.1974) (holding that consequences such as deportation are collateral since they are civil proceedings administered by another agency over which the trial judge has no control).

In *Rivera v. State*, 180 Md.App. 693, 721, 952 A.2d 396 (2008), *aff'd*, 409 Md. 176, 973 A.2d 218 (2009), Judge Rodowsky wrote for this Court in stating:

*Possible deportation is not one of "the [direct] consequence of the plea"* about which the court is directed, by Rule 4–242(c), to inquire when a guilty plea is tendered.

(Emphasis supplied).

■ This categorization of deportation as a collateral consequence of a conviction is vitally important because of the dispositive distinction made by the caselaw between direct consequences and collateral consequences in terms of the advice that the Sixth Amendment requires to be given to a defendant contemplating a plea of guilty. The Sixth Amendment demands effective advisement about direct consequences. It is indifferent to collateral consequences.

### The Great Direct Consequence—Collateral Consequence Divide

The line that has historically been drawn between advice as to the consequences of a guilty plea that is constitutionally required and advice as to other consequences that is not constitutionally required, no matter how valuable such advice might be, is the line that separates direct consequences from collateral consequences. The Maryland Bible on that distinction is the opinion of Judge Raker for the Court of Appeals in *Yoswick v. State*, 347 Md. 228, 700 A.2d 251 (1997).

 A collateral consequence is not less weighty than a direct consequence. It is simply less direct. *Yoswick* explained, *id.* at 240, 700 A.2d 251.

> *A direct consequence* of a guilty plea has been defined as one that *has* "a definite, *immediate* and largely automatic effect on the range of the defendant's punishment."

(Emphasis supplied). The sentence of imprisonment or the fine that might be imposed upon a conviction is a quintessential direct consequence.

A conviction may also entail a number of indirect or collateral consequences, some of which may be more onerous and devastating than the direct consequences of the conviction.[4] The gravity of the consequence, however, has never been the Sixth Amendment criterion. As Judge Raker pointed out:

> The imposition of a sentence may have a number of collateral consequences and *a plea of guilty is not rendered involuntary in the constitutional sense if the defendant is not informed of the collateral consequences. Due Process does not require that a defendant be advised of the indirect or collateral consequences of a guilty plea,* even if the consequences are foreseeable. Accordingly, under Maryland Rule 4–242, *the consequences of the plea include only direct consequences, not collateral or indirect consequences.*

*Id.* at 240, 700 A.2d 251 (emphasis supplied). The opinion pointed out, *id.,* that "numerous other jurisdictions have also made this distinction," as it cited seven United States Courts of Appeal and eight sister states without noting a dissenting voice.

In the *Yoswick* case itself, the defendant had been led to believe that he would be eligible for parole within 10 years and only later learned that he would not be eligible for parole until

---

**4.** As the United States Circuit Court of Appeals for the Eleventh Circuit pointed out in *United States v. Campbell,* 778 F.2d 764, 769 (11th Cir.1985):

Deportation is admittedly a harsh consequence of a guilty plea, but so are many other "collateral consequences."

he had served 15 years. His petition for post-conviction relief made the following claim:

In his Amended Petition for Post Conviction Relief, Petitioner contended that: (1) his plea did not comply with Maryland Rule 4–242(c) because he was not informed that, in order to become eligible for parole, he had to first serve fifteen years, and (2) he received ineffective assistance of counsel because counsel misadvised him regarding the requirements for parole.... Yoswick testified that he spoke with his trial attorney in August 1992, and she told him that if he accepted the State's plea offer, his sentence would be forty years and he would be eligible for parole after ten years.... *He said that had he been advised correctly, he would not have pleaded guilty.* His trial counsel also testified at the hearing. She stated that the original plea agreement was for a straight forty-year sentence and that she had called the parole commission and learned that an inmate must serve approximately one-fourth of his sentence before becoming eligible for parole. The plea agreement was later changed to a life sentence with all but forty years suspended. Defense counsel could not remember if she told Yoswick about parole eligibility restrictions imposed by Maryland Code (1957, 1990 Repl.Vol.), Article 41, § 4–516(b), the statutory provision in effect at the time.

*Id.* at 236, 700 A.2d 251 (emphasis supplied)

Judge Raker's opinion noted that this Court, in an unpublished opinion, had similarly held that "a defendant must be advised only of direct consequences ... and not collateral consequences."

*The Court of Special Appeals ... held that a defendant must be advised only of direct consequences of a plea of guilty, and not collateral consequences.* The intermediate appellate court held that parole eligibility is a collateral consequence of a plea of guilty and, accordingly, the trial court is not required to furnish a defendant with information

about parole eligibility in order for a plea to be voluntary. We agree and shall affirm.

*Id.* 347 Md. at 238, 700 A.2d 251 (emphasis supplied).

The rationale for the holding of the Court of Appeals, it should be noted, was not based on the parole consequences of a conviction specifically but, categorically, on collateral consequences generally:

In this case we must decide whether a judge's failure to advise a defendant offering to plead guilty of the parole consequences of the sentence renders the plea unknowing and involuntary. We shall hold that *the trial court's failure to advise a defendant who is planning to plead guilty of parole consequences does not render a plea invalid because parole consequences are collateral rather than direct consequences of a guilty plea.*

*Id.* at 231, 700 A.2d 251 (emphasis supplied).

In explaining why it was holding that parole eligibility is a collateral consequence rather than a direct consequence of a conviction, the Court of Appeals pointed out, inter alia, that a parole decision "falls within the province of ... the executive branch" rather than being a decision "within the jurisdiction of the courts." That distinction applies as surely to deportation as it does to parole eligibility.

*Parole eligibility typically is considered a collateral consequence and thus,* information about parole eligibility *is not among those consequences that a defendant must understand at the time a plea is entered....* Because parole is a collateral consequence of a guilty plea, the failure of the trial court to advise the defendant concerning parole eligibility does not render a plea involuntary or invalid.

*Parole eligibility falls within the province of the Parole Commission and the executive branch, and not within the jurisdiction of the courts.* Moreover, *parole eligibility lacks the definite, immediate, and largely automatic characteristics that define a direct consequence. Parole depends on* many factors beyond the control of the courts, ranging from diminution credits earned to *the exercise of discretion by the Parole Commission.* Accordingly, we hold

today that *parole eligibility is not a direct consequence of a plea* and thus it follows that *a defendant need not be informed of parole ramifications* for a guilty plea to be voluntary.

*Id.* at 241, 700 A.2d 251 (emphasis supplied).

Ten years before *Yoswick* was decided, this Court considered another consequence of a conviction to be collateral rather than direct. It was the capacity of a conviction to serve as a subsequent predicate for an enhanced sentence should the present defendant turn out to be a subsequent offender. In *Moore v. State,* 72 Md.App. 524, 525, 531 A.2d 1026 (1987), Judge Weant posed the question before us.

> Appellant, however, was never advised that if he is convicted of another "crime of violence" in the future, the daytime housebreaking convictions would make him eligible for mandatory sentencing under Md. Ann.Code art. 27, § 643B (1986 Supp.). We granted leave to appeal to answer the question: "Was Appellant properly advised of the consequences of his guilty plea?"

Our opinion looked to a number of collateral consequences about which a defendant, when offering a guilty plea, need not be advised.

> Prior cases indicate that "consequences" is not to be read as broadly as appellant reads it. Thus, *the defendant must be made aware of the maximum sentence he can receive when pleading guilty. Bryant v. State,* 47 Md.App. 551, 424 A.2d 1115 (1981). But *he need not be told that his conviction could cause him to be deported* in a separate civil proceeding; *Daley v. State,* 61 Md.App. 486, 487 A.2d 320 (1985) (per curiam); *that the judge may use sentencing guidelines, Durbin v. State,* 56 Md.App. 442, 468 A.2d 145 (1983); *the nature of a suspended sentence with probation, id.;* or *that he may be referred to Patuxent Institution for a potentially indefinite* (at that time) *period, Smith v. Director,* 13 Md.App. 53, 280 A.2d 910 (1971).

*Id.* at 526, 531 A.2d 1026 (emphasis supplied).

Our opinion explained that the underlying and unifying rationale for all of those specific instances was the critical

distinction between direct consequences and collateral conse-
quences.

> In *Daley, supra*, this Court recognized *the distinction*
> drawn by other courts *between direct and collateral conse-*
> *quences of a guilty plea.* Courts generally hold that for the
> plea to be accepted, *the defendant must be made aware of*
> *the former, but not the latter. A consequence is considered*
> *direct only if* "*the result represents a definite, immediate*
> *and largely automatic effect on the range of the defendant's*
> *punishment.*"

*Id.* (emphasis supplied).

Our holding that future enhanced sentencing is only a
collateral consequence was based in part on our earlier hold-
ing that deportation was only a collateral consequence.

> Further, *if the deportation of a resident alien* based *solely*
> upon the conviction at issue in *Daley, supra, is not a*
> *consequence within the meaning of Rule 4–242(c), then* a
> fortiori the more tenuous risk of *enhanced sentencing for a*
> *future crime is not.*

*Id.* at 527, 531 A.2d 1026 (emphasis supplied).

In *Holmes v. State*, 401 Md. 429, 473–74, 932 A.2d 698
(2007), the Court of Appeals not only reaffirmed *Yoswick's*
distinction between direct and collateral consequences but
further pointed out that Rule 4–242(e) expressly provides that,
notwithstanding the directive to advise with respect to certain
collateral consequences, the "omission of advice concerning
[those] collateral consequences" does not "mandate that the
plea be declared invalid."

> [W]hile Maryland Rule 4–242, in 1992 and now, requires the
> judge to inform the defendant of the direct consequences of
> the plea, *Yoswick v. State* (1997), the failure to advise of
> collateral consequences then and now have not been the
> basis to vacate a guilty plea; now it is explicated in *the*
> *Rule,* which *provides:* "*[O]mission of advice concerning the*

*collateral consequences of a plea does not itself mandate that the plea be declared invalid."*

(Emphasis supplied).

What makes certain costs of a criminal conviction collateral? Let us count the ways. Or, at least, some of them as illustrative of the larger phenomenon. If following a conviction for drunken driving, the Motor Vehicle Administration should suspend or revoke one's driving privileges, that's a collateral consequence. If following a felony conviction, one may no longer vote or hold public office, that's a collateral consequence. If following a conviction, one may face enhanced sentences for future crimes, that's a collateral consequence. If following a conviction, one is found guilty of a violation of probation for some earlier offense, that's also a collateral consequence. If one is not eligible for parole or only for delayed parole, that's a collateral consequence. A prohibition on the right to bear firearms is a collateral consequence.

If following a conviction for a sexual offense, one is required to register as a sex offender, that's a collateral consequence. (In 2008, Maryland Rule 4–242(e) was further amended so as to add subsection (e)(2) and to require that a defendant pleading to any of a series of sex offenses be advised by judge, prosecutor, or defense attorney about the collateral consequences of having to register as a sex offender.) If following a conviction for child abuse, one is barred from employment as a teacher or a pediatrician or a scoutmaster, that too is a collateral consequence. If one's passport is lifted and one may not travel abroad, that's a collateral consequence. If following a guilty plea to bribery, one is forced to resign the Vice Presidency of the United States, that's a collateral consequence. If following a hypothetical plea to covering up a "third-rate burglary," one could be impeached as President of the United States, even that would be a collateral consequence. And, of course, being deported is also a collateral consequence, but there is nothing unique about it compared to some of the other collateral consequences. As *United States v. Campbell,* 778 F.2d 764, 769

(11th Cir.1985), noted: "We do not find deportation so unique as to warrant an exception to the general rule that a defendant need not be advised of the [collateral] consequences of a guilty plea." *See also United States v. Del Rosario,* 902 F.2d 55, 59 (D.C.Cir.1990).

In each of these instances, it is not the criminal court judge who takes the plea who imposes the consequence. The source of the consequence is some other person or some other arm of government or the operation of some other law. That's what makes it collateral.

### The Consequence of Deportation Specifically

In *Daley v. State,* 61 Md.App. 486, 487 A.2d 320 (1985), the defendant, a native of Jamaica, entered a plea of guilty. He was never advised by anyone that his conviction would subject him to a risk of deportation. Deportation proceedings were subsequently instituted against him. In his petition for post-conviction relief, he contended 1) that the absence of necessary advice rendered his guilty plea involuntary; and 2) that, because of the failure of his lawyer to warn him about deportation, he was denied the effective assistance of counsel guaranteed by the Sixth Amendment. *Daley* first pointed out, 61 Md.App. at 488–89, 487 A.2d 320:

> *Courts in other states distinguish between direct and collateral consequences, requiring courts to inform defendants of the former, but not of the latter.* Whether this distinction applies in Maryland has not been found in any reported Maryland appellate decision, though cases have held that courts have no duty to inform defendants of such consequences as the possibility of reference to Patuxent Institution or the nature of a suspended sentence on probation.

(Emphasis supplied).

The opinion then pointed to federal precedent and analyzed seven cases from six separate United States Courts of Appeal.

Federal courts have uniformly interpreted this language to require trial courts to inform defendants only of direct, as opposed to collateral, consequences.

61 Md.App. at 489, 487 A.2d 320. *Daley's* conclusion was that deportation was only a collateral consequence.

> *[T]his court is constrained to follow the overwhelming weight of authority in this country that the trial court's failure to advise Petitioner of possible deportation proceedings did not affect the voluntariness of his guilty plea.* Petitioner's first contention is therefore denied.

61 Md.App. at 490, 487 A.2d 320 (emphasis supplied).

To bolster its conclusion that deportation was only a collateral consequence, *Daley* used the same framework of analysis later employed in *Yoswick v. State.*

> [T]he consequence of deportation arises from a separate civil proceeding. Whereas Petitioner's guilty plea was entered in state criminal court, deportation is adjudicated in federal civil court. Furthermore, deportation is neither "definite" nor "largely automatic."

*Daley v. State* (1985) was, to be sure, decided 14 years before Rule 4–242 was amended, in 1999, to include subsection (e)'s requirement that warnings be given to noncitizens about the risk of deportation. The Committee note to § 4–242(e), however, expressly states, "This Rule does not overrule *Yoswick v. State*, 347 Md. 228, 700 A.2d 251 (1997), and *Daley v. State*, 61 Md.App. 486, 487 A.2d 320 (1985)."

### Should the Sixth Amendment Be Regionalized?

In assessing the performance of counsel, *Strickland*, of necessity, uses very flexible language: "the range of competence demanded of attorneys in criminal cases"; "reasonableness under prevailing professional norms"; "reasonable considering all the circumstances"; and "the variety of circumstances faced by defense counsel on the range of legitimate decisions." 466 U.S. at 687–89, 104 S.Ct. 2052. The appellee seizes upon this linguistic malleability to argue that Maryland Rule 4–242(e) operates to create for criminal defense lawyers in Maryland a higher standard by which to measure an individual attorney's performance than that which prevails in states without such a rule of procedure.

He claims that Rule 4–242(e) raises the bar locally. It is a legitimate issue, and it deserves thoughtful consideration. It is, however, a notion which, although at first mention having a surface plausibility, turns out to be unworkable once its ramifications are seriously considered.

■ *Strickland's* peer group whose general performance level sets the standard is, to be sure, not all attorneys but a very particular subset of them. To avoid being deemed ineffective, it will not suffice for a lawyer to be a proficient land use attorney or a skilled tax expert. *Strickland* requires of the practitioner who ventures even occasionally into the criminal law that his performance be "within the range of competence demanded of attorneys in criminal cases." 466 U.S. at 688, 104 S.Ct. 2052. That, however, is the full extent to which the peer group that establishes the standard is parochialized into a subset.

■ *Strickland's* performance standard is a national standard that will not be regionalized on a state-by-state or even more localized basis. To allow state statutes or rules of court to calibrate upward or downward the expected performance level could fragment the Sixth Amendment's performance prong into a fifty-pronged test that both would be unworkable and would divest the Supreme Court of its superior ability to recognize and to announce what the Sixth Amendment actually requires.

If, *arguendo,* the appellee's contention that the performance level should be measured on a more localized basis were correct, who could say that the parochialization should be state-by-state rather than county-by-county? In terms familiar to any movie buff, may we measure the performance of the rural practitioner from the Upper Peninsula's Thunder Bay by the same scale we apply to the down-state hot shot from Lansing? May the Sixth Amendment demand more of Philadelphia than it does of Dogpatch? How, indeed, might a court establish the performance standard for a one-lawyer county on Alaska's North Slope or on the periphery of the Okefenokee? To ask the critical question is to answer it, lest a national

standard be reduced to geographic pandemonium. There is nothing in the language of *Strickland v. Washington* that suggests anything other than a single national standard for criminal law practitioners.

As cases such as *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. 2052; *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); and *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), refer to bar association standards as helpful guidelines in evaluating the performance of attorneys, the references are to the American Bar Association and Standards of Criminal Justice that are nationwide. As *Strickland* stated, 466 U.S. at 688, 104 S.Ct. 2052:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. *Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g.* ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed 1980) ("The Defense Function"), *are guides to determining what is reasonable, but they are only guides.*

(Emphasis supplied).

■ Perhaps carrying coals to Newcastle, we point out yet another reason why Maryland Rule 4–242(e) cannot cause *Strickland's* performance prong to fluctuate. The constitutional critique of *Strickland* is adverbial. It measures the **HOW** something is being done and not the quiddity of **WHAT** is being done. The appellee assumes that in promulgating a new demand, Rule 4–242(e) had altered the lawyers' performance level. It, of course, has done no such thing. If a statute or a rule of procedure articulates a requirement but the majority of criminal practitioners proceed to ignore it, the performance level, which is quintessentially adverbial and not substantive, has self-evidently not budged. The appellee has offered us neither evidence nor argument in this regard. Even if, *arguendo,* the *Strickland* test were permitted to fluctuate on a regional basis, what must be measured would

still be the performance of the local actors and not the substantive content of the local script.

In terms of the substantive impact of the local script, we further note, Rule 4–242(e) was amended in 2008 to direct that judge, prosecutor, or defense attorney advise a client contemplating a guilty plea to a sex offense about the collateral consequences of being required to register as a sex offender. Is that, per the appellee's argument, also now a part of *Strickland's* performance prong? If hypothetically the Rules of Procedure were to be amended tomorrow to require that advice be given as to all collateral consequences, Maryland's version of *Strickland's* performance prong would, were the appellee's argument to prevail, be grotesquely bloated. *Strickland's* two-pronged test will not be transformed into a Hydra-headed monstrosity, with performance standards ebbing and flowing unpredictably at the whimsy of a local legislature or local rules committee. In short, Rule 4–242(e) has not amended or modified the Sixth Amendment. It will not be regionalized.

■ When we speak of a uniform national performance standard demanded by the Sixth Amendment, we are not for a moment suggesting that the undergirding playing field of the criminal law itself does not vary from state to state. Of course it does. The elements of crimes and the very establishment of certain behavior as criminal are things that necessarily vary widely from state to state. The constitutionally required minimum performance level of the defense attorney, however, remains a uniform national requirement.

### Fourth Amendment Analogy

■ An analogous attempt to regionalize the Fourth Amendment was made and was rejected by the Supreme Court in *Virginia v. Moore*, 553 U.S. 164, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008). Just as there is a surface plausibility in the present case in the appellee's maintaining that a reasonable performance by an attorney should include obeying pertinent state laws and rules of court, the defendant in *Virginia v.*

*Moore* maintained that a reasonable search and seizure is one that does not violate applicable state laws. The question before the Supreme Court was whether a Virginia officer "violates the Fourth Amendment" by making an arrest that, albeit permissible by Fourth Amendment standards, is "prohibited by state law." 553 U.S. at 166, 128 S.Ct. at 1601, 170 L.Ed.2d at 564.

Virginia traffic officers stopped Moore and learned that his driver's license had been suspended. For such an offense, Virginia law provides that a traffic citation may be issued but that a custodial arrest may not be made. The officers, in uncontested violation of Virginia law, made a custodial arrest and an attendant search incident, recovering crack cocaine in the process. In arguing for suppression of the evidence, Moore contended that the violation of Virginia law made the search constitutionally unreasonable. The Virginia Supreme Court held that the Fourth Amendment had been violated. In a unanimous decision, the United States Supreme Court reversed. Justice Scalia's opinion announced:

> We thought it obvious that *the Fourth Amendment's meaning did not change with local law enforcement practices— even practices set by rule.* While those practices "vary from place to place and from time to time," *Fourth Amendment protections are not "so variable" and cannot "be made to turn upon such trivialities."*

(Emphasis supplied).

The opinion pointed out the confusion that could follow if a constitutional requirement could rise or fall with idiosyncratic state law.

> *Incorporating state-law arrest limitations into the Constitution would produce a constitutional regime no less vague and unpredictable than the one we rejected in Atwater.* The constitutional standard would be only as easy to apply as the underlying state law, and state law can be complicated indeed.

*Id.* at 175, 128 S.Ct. at 1606, 170 L.Ed.2d at 570 (emphasis supplied). The Court referred to an inevitable consequence of the defendant's position.

[L]inking Fourth Amendment protections to state law would cause them to "vary from place to place and from time to time."

*Id.* The Supreme Court expressly cautioned against the type of random proliferation of requirements that would make the administration of a constitutional precept more difficult.

In determining what is reasonable under the Fourth Amendment, *we have given great weight to the "essential interest in readily administrable rules."*

*Id.* at 175, 128 S.Ct. at 1606, 170 L.Ed.2d at 569 (emphasis supplied).

A national constitutional standard should not and will not fluctuate with local practices.

[W]hile States are free to regulate such arrests however they desire, *state restrictions do not alter the Fourth Amendment's protections.*

*Id.* at 176, 128 S.Ct. at 1607, 170 L.Ed.2d at 571 (emphasis supplied).

The Supreme Court left no doubt as to the constitutional bottom line:

While "[i]ndividual States may surely construe their own constitutions as imposing more stringent constraints on police conduct," state law did not alter the content of the Fourth Amendment.

*Id.* at 172, 128 S.Ct. at 1604, 170 L.Ed.2d at 568.

A state, of course is free to establish enhanced state requirements but they do not thereby become the concern of constitutional law.

[T]he arrest rules that the officers violated were those of state law alone, and as we have just concluded, *it is not the province of the Fourth Amendment to enforce state law.*

*Id.* (emphasis supplied). *See also Atwater v. Lago Vista,* 532 U.S. 318, 347, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001); *Whren*

*v. United States,* 517 U.S. 806, 815, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *California v. Greenwood,* 486 U.S. 35, 43, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); *Cooper v. California,* 386 U.S. 58, 62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

In terms of the clash between a uniform national standard, on the one hand, and a shifting or fluctuating set of state or regional standards, on the other hand, we can conceive of no principled difference between the Fourth Amendment and the Sixth Amendment.

### An Unbroken Phalanx of Federal Authority

In the last analysis, we are dealing with federal constitutional law pursuant to the Sixth Amendment. In the absence of a definitive statement from the Supreme Court on the relationship between the effective assistance of counsel and advice about deportation,[5] the most persuasive voices on the subject are those of the United States Circuit Courts of Appeal. Nine

---

**5.** A case dealing at least obliquely with the subject is currently awaiting decision by the Supreme Court. *Padilla v. Kentucky* was argued on October 13, 2009. Certiorari had been granted on February 23, 2009,- —— U.S. ——, 129 S.Ct. 1317, 173 L.Ed.2d 582, with one of the questions before the Court, as stated in the petitioner's brief, being: "In providing the effective assistance guaranteed by the Sixth Amendment, does defense counsel never have a duty to investigate and advise a noncitizen client whether the offense to which he is pleading guilty will result in his deportation?"

In *Commonwealth v. Padilla,* 253 S.W.3d 482 (Ky.2008), the postconviction petitioner, a native of Honduras, had entered a guilty plea to drug-related charges. He claimed that his lawyer misinformed him about the risks of deportation and that that constituted the ineffective assistance of counsel. The Kentucky Court of Appeals ruled in the petitioner's favor, distinguishing between the mere failure to give advice, which would not have afforded grounds for relief, and the affirmative giving of incorrect advice. The Kentucky Supreme Court rejected the distinction and denied relief. The Court was split by a vote of five to two. The case of *Commonwealth v. Fuartado,* 170 S.W.3d 384 (Ky.2005), on which the majority in *Padilla* relied, was a case in which no advice about deportation had been given, as distinguished from the giving of erroneous advice. It had no occasion to consider a possible distinction between non-advice and bad advice. *United States v. Couto,* 311 F.3d 179, 187–88 (2d Cir.2002), was a decision that made precisely that distinction.

of the twelve circuits have spoken, and the verdict is unanimous. In chronological order of decision, those holdings are:

### 1975, Second Circuit:

The Second Circuit had earlier held in *United States v. Santelises*, 476 F.2d 787 (1973), that Santelises's guilty plea was not involuntary because he had not been informed, when offering his guilty plea, that deportation was a collateral consequence. *See also Michel v. United States*, 507 F.2d 461 (2d Cir.1974). In *United States v. Santelises*, 509 F.2d 703 (1975), the same petitioner returned to court after the denial of his *coram nobis* petition with the additional contention that he had been denied the effective assistance of counsel guaranteed by the Sixth Amendment. The Second Circuit responded that the mere failure to advise the client about deportation does not even state a claim.

> All that is new is an appended affidavit from Robert Mitchell—his counsel at the plea proceedings—which states that *Mitchell did not inform Santelises that he might be subject to deportation.* This affidavit, however, is of no legal significance. *Since Mitchell does not aver that he made an affirmative misrepresentation, Santelises fails to state a claim for ineffective assistance of counsel.*

*Id.* at 704 (emphasis supplied).

### 1985, Eleventh Circuit:

*United States v. Campbell*, 778 F.2d 764 (11th Cir.1985), was a case in which a Cuban national entered a guilty plea to the possession of narcotics. Deportation proceedings were subsequently instituted against her. She moved to set aside her guilty plea on the ground that she had not been informed, at the time of the plea, about the deportation consequences. Counsel conceded that he gave no such advice because he was unaware of the deportation consequences.

> Campbell's *trial counsel concedes* in an affidavit submitted in support of Campbell's section 2255 motion *that he did not advise Campbell of the deportation consequence* of the guilty plea *because he was not aware of that consequence.*

778 F.2d at 766 (emphasis supplied). The Eleventh Circuit refused to impose on counsel an obligation to advise a client contemplating a plea with respect to deportation consequences.

> [S]he urges us to impose upon trial counsel an obligation ... to advise alien defendants of the potential deportation consequences of a guilty plea. We have found no authority to support this proposition, and Campbell has cited none. Finding this proposition untenable, we deny Campbell relief under this theory.
>
> ... Furthermore, *deportation is a collateral consequence of a guilty plea and, therefore, ... "need not be explained to the defendant in order to ensure that the plea is voluntary."*

778 F.2d at 767 (emphasis supplied).

With respect to the claim of ineffective assistance specifically, the Court stated emphatically:

> Campbell alleges that she would not have pleaded guilty if her trial counsel had advised her of the deportation consequences of the plea. *This bare allegation is not sufficient, however, to establish prejudice under Strickland.*
>
> . . . .
>
> ... [A] defendant's lack of knowledge of those collateral consequences cannot affect the voluntariness of the plea. Accordingly, *counsel's failure to advise the defendant of the collateral consequences of a guilty plea cannot rise to the level of constitutionally ineffective assistance.*

778 F.2d at 768 (emphasis supplied).

The Eleventh Circuit did acknowledge that there might be a different result if counsel had given erroneous information instead of giving no information at all.

> Counsel's *affirmative misrepresentation* in response to a specific inquiry from the defendant *may,* however, *under certain circumstances, constitute ineffective assistance* of counsel. *Campbell has failed to allege that her trial counsel made any such misrepresentation.* We hold, therefore, that *Campbell has failed to demonstrate that she was*

*prejudiced by her trial counsel's failure to advise her of the deportation consequences of the guilty plea.*

778 F.2d at 768–69 (emphasis supplied).

### *1988, Fourth Circuit:*

In *United States v. Yearwood,* 863 F.2d 6 (4th Cir.1988), the defendant entered a guilty plea to a charge of conspiracy to distribute cocaine and was subsequently proceeded against for deportation. He sought to vacate the plea on the ground that, because of lack of advice, he had been denied the effective assistance of counsel.

With new counsel, Yearwood filed a § 2255 motion, alleging that *his previous counsel failed to advise him of the collateral consequence of deportation* mandated by his guilty plea.

863 F.2d at 7 (emphasis supplied). The Fourth Circuit flatly rejected the contention.

Turning to the issue raised in defendant's § 2255 motion, we agree with the circuits which have decided the issue and found that *an attorney's failure to advise a client that deportation may result from a conviction does not constitute ineffective assistance of counsel.* . . .

*Defendant's trial counsel had no spontaneous duty to inform defendant that his guilty plea would lead to his being deported.*

863 F.2d at 7–8 (emphasis supplied).

### *1989, Seventh Circuit:*

In *Santos v. Kolb,* 880 F.2d 941 (7th Cir.1989), a Cuban national entered guilty pleas in a Wisconsin state court to three counts of burglary. At the time of his appeal from the denial of a writ of habeas corpus in federal court, immigration authorities had made no final decision on deportation or on the petitioner's request for political asylum. At his post-conviction hearing in a Wisconsin state court, the petitioner claimed that he had been denied the effective assistance of counsel.

*Petitioner* moved for postconviction relief in the Wisconsin state trial court, *alleging that his trial counsel's failure to advise him of the immigration consequences of conviction* and the failure to seek a judicial recommendation against deportation *deprived him of his right to effective assistance of counsel.* The trial court denied relief without a hearing. The Wisconsin Court of Appeals affirmed.

880 F.2d at 942 (emphasis supplied).

On habeas corpus, the petitioner claimed that he would not have pleaded guilty if he had known of the pertinent deportation law.

*He argued that had he known of the immigration consequences of conviction* or that a judicial recommendation against deportation could be sought, *he would not have pleaded guilty* without first seeking such relief, if he would have pleaded guilty at all.

880 F.2d at 942 (emphasis supplied).

The Seventh Circuit held that the Sixth Amendment obligations do not extend to advising a client about the collateral consequences of a plea, including deportation.

In a recent and similar case, we held that *it was not ineffective assistance of counsel for an attorney to fail to inform his client of the immigration consequences of a conviction* for a drug offense. In *United States v. George,* 869 F.2d 333 (7th Cir.1989), we stated:

... *A deportation proceeding is a civil proceeding which may result from a criminal prosecution, but is not a part of or enmeshed in the criminal proceeding. It is collateral to the criminal prosecution.* While the Sixth Amendment assures an accused of *effective assistance of counsel* in *"criminal prosecutions," this assurance does not extend to collateral aspects of the prosecution.*

880 F.2d at 944 (emphasis supplied).

The Seventh Circuit stressed that the critical issue was not whether the lawyer behaved adequately but whether the lapse, if a lapse occurred, was constitutional in dimension.

> *The issue is not whether defense counsel erred in not discussing deportation, but whether his error amounted to a constitutional violation* .... *The failure* of petitioner's counsel to inform him of the immigration consequences of his guilty plea, *however unfortunate* it might be, *simply does not deprive petitioner of the effective assistance of counsel guaranteed by the Constitution.*
>
> Moreover, the fact that some jurisdictions have enacted statutes to guard against the failure to inform a defendant regarding deportation does not mean that the providing of such information is constitutionally mandated.

880 F.2d at 944–45 (emphasis supplied). *See also United States v. George,* 869 F.2d 333 (7th Cir.1989).

It is that tightly focused concern of the Seventh Circuit that is our equally tightly focused concern in the present case. We are not asking whether the lack of advice was good or bad. We are only asking whether it was unconstitutional.

### *1990, District of Columbia Circuit:*

In *United States v. Del Rosario,* 902 F.2d 55 (D.C.Cir.1990), the defendant, a citizen of the Dominican Republic, entered a guilty plea to the possession of cocaine with the intent to distribute. His lawyer failed to inform him that a conviction would likely result in his deportation. After he served his 10–month sentence, the Immigration and Naturalization Service did move to deport him. The Court rejected the petitioner's claim that he had been denied the effective assistance of counsel.

> [W]e adopt as the proper rule the view endorsed by several of our sister circuits that *"counsel's failure to advise the defendant of the collateral consequences of a guilty plea cannot rise to the level of constitutionally ineffective assistance."*

902 F.2d at 59 (emphasis supplied). More particularly, the Court ruled that the failure to advise did not represent a failure to satisfy the performance prong of *Strickland v. Washington's* two-pronged test.

*[T]rial counsel's failure to advise a defendant of the collateral consequence of a plea of guilty affecting the possibility of the deportation of the defendant, does not fall short of the "objective standard of reasonableness," testing the adequacy of counsel's representation under Strickland.*

*Id.* (emphasis supplied).

The Court also opined on the variety of collateral consequences, and it rejected the notion that deportation calls for any special or exceptional treatment.

Collateral consequences of a guilty plea are many. They may include the loss of civil service employment, of the right to vote and to travel freely abroad, of the right to a driver's license, and of the right to possess firearms. But we have long held that a defendant's incomplete awareness of collateral consequences of a guilty plea does not render that plea involuntary....

*Deportation is a harsh collateral consequence, but many other collateral consequences are also harsh.* In common with the Eleventh Circuit *"we do not find deportation so unique as to warrant an exception to the general rule that a defendant need not be advised of the [collateral] consequences of a guilty plea."*

*Id.* (emphasis supplied).

### *1992, Tenth Circuit:*

In *Varela v. Kaiser,* 976 F.2d 1357 (10th Cir.1992), the petitioner entered guilty pleas to five drug charges in an Oklahoma state court. He was later proceeded against for deportation. On federal habeas corpus, he claimed that his attorney's failure to advise him about the risk of deportation denied him the effective assistance of counsel. The Tenth Circuit held that the Sixth Amendment guarantee does not include advice as to collateral consequences.

"While *the Sixth Amendment* assures an accused of effective assistance of counsel in 'criminal prosecutions,' this *assurance does not extend to collateral aspects of the prosecution."* ...

The circuits that had addressed the issue of failure of counsel to inform an accused of the likely deportation consequences arising out of a guilty plea have all held that *deportation is a collateral consequence of the criminal proceeding and therefore the failure to advise does not amount to ineffective assistance of counsel.*

976 F.2d at 1358 (emphasis supplied).

### *1993, Fifth Circuit:*

In *United States v. Banda,* 1 F.3d 354 (5th Cir.1993), the petitioner entered a guilty plea and was subsequently proceeded against for deportation. "The thrust of Banda's complaint is that he was denied the effective assistance of counsel because his attorney in the criminal proceeding did not tell Banda that he might be subject to deportation if he pleaded guilty to the charge." 1 F.3d at 355.

The Fifth Circuit first rejected a due process claim that the plea was involuntary.

Banda claims now that if he had known of the possibility of deportation he would not have pleaded guilty. . . .

In *United States v. Gavilan, we nailed the door shut on any due process claim based on counsel's failure to warn the criminal defendant of possible deportation.* This court noted that *defendants have no due process right to be informed of the collateral consequences of criminal proceedings.* That principle applies even to harsh collateral consequences, such as loss of the right to vote, to travel abroad, or to drive a car.

1 F.3d at 355 (emphasis supplied).

The Court then rejected the Sixth Amendment claim that Banda had been denied the effective assistance of counsel.

The courts that have addressed the question of counsel's failure to warn of possible deportation have uniformly held that *deportation is a collateral consequence of the criminal process* and hence *the failure to advise does not amount to ineffective assistance of counsel. We are not aware of any court that has held to the contrary.* Indeed, this conclusion

squares with the Supreme Court's observation that the accused must be "fully aware of the *direct* consequences" of a guilty plea. *Brady v. United States*[, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747] (1970). We find this position persuasive and adopt it as our own.

1 F.3d at 356 (emphasis supplied).

### *2000, First Circuit:*

*United States v. Gonzalez*, 202 F.3d 20 (1st Cir.2000), was a case in which a Cuban national entered guilty pleas to two charges of mail fraud and the use of an unauthorized access device to obtain property exceeding $10,000 in value. The latter conviction subjected him to the risk of deportation or indefinite detention. Because his lawyer had not informed him of the immigration consequences, the petitioner claimed, inter alia, that he had been denied the effective assistance of counsel. The First Circuit confirmed that immigration problems are simply a collateral consequence.

> Counsel's failure to advise a defendant of a collateral consequence is a legally insufficient ground for a plea withdrawal. *United States v. George* (1989) ("*While the Sixth Amendment assures an accused of effective assistance of counsel in 'criminal prosecutions,' this assurance does not extend to collateral aspects of the prosecution.*").

202 F.3d at 25 (emphasis supplied).

The Court then held that the failure to advise about immigration consequences did not amount to the ineffectiveness of counsel.

> In [*United States v.*] *Quin*[, 836 F.2d 654 (1st Cir.1988)], *the defendant had "waived a jury* and acceded to a bench trial *in ignorance of the deportation consequences of a guilty finding due to the failure of his counsel to inform him* thereof; *[defendant argued] that this constituted constitutionally ineffective counsel,* and that he [was thus] entitled to start over." *We disagreed,* noting that as a "collateral consequence" of conviction, *deportation was "legally irrelevant, even as to an outright guilty plea."* ("A

deportation proceeding is a civil proceeding which may result from a criminal prosecution, but is not a part of or enmeshed in the criminal proceeding. It is collateral to the criminal prosecution.").

*Id.* (emphasis supplied).

### 2003, Ninth Circuit:

*United States v. Fry,* 322 F.3d 1198 (9th Cir.2003), was a case in which a convicted Canadian citizen, being processed for deportation, claimed the he had been denied the effective assistance of counsel because his lawyer had "not informed him that he could be deported if convicted." 322 F.3d at 1200. The standard for effective assistance is the performance prong of *Strickland v. Washington's* two-pronged test.

> *Fry's trial counsel did not perform deficiently by failing to inform Fry that he could be deported if convicted at trial.* The performance was deficient only if it "fell below an objective standard of reasonableness." ... All other circuits to address the question have concluded that *"deportation is a collateral consequence of the criminal process and hence the failure to advise does not amount to ineffective assistance of counsel."*

322 F.3d at 1200 (emphasis supplied).

The Ninth Circuit held squarely that the absence of warnings as to deportation did not constitute the ineffective assistance of counsel.

> We have also held that *counsel's failure to advise a defendant of a collateral penalty is not objectively unreasonable and therefore does not amount to ineffective assistance.* This line of authority in our circuit compels holding, consistent with our sister circuits, that counsel's failure to advise a defendant of collateral immigration consequences of the criminal process does not violate the Sixth Amendment right to effective assistance of counsel.

*Id.*

\* \* \*

In the path of this unrelenting juggernaut of constitutional caselaw, the result was inevitable. The Sixth Amendment

does not impose on a lawyer a duty to inform a client contemplating a guilty plea about collateral consequences generally or the risk of deportation specifically. Our conclusion ineluctably follows: One cannot be guilty of breaching a constitutional duty if such a constitutional duty does not exist.

### Uprooted

It is, of course, impossible in this case not to feel compassion for the appellee. Banishment is a cruel fate. If that compassion is to be anything more than unrestrained emotion, however, it needs to be tempered with some realistic perspective. For a thirty-one-year-old man, who has lived in Harford County since he was a boy of 14 and who has grown up in the county and been graduated from the local high school, the prospect of being forever exiled to a world but dimly remembered was, indeed, a grim specter. It was a specter, however, that if it were to have had any helpful influence on the appellee's choices, needed to be confronted before he committed the crime, not later as he sat at the trial table.

At the trial table, he no longer had any realistic options left. His appreciation of the wages of sin was already hopelessly too late. The grim apparition of expatriation peered down mercilessly upon him, whether he folded his hand immediately or whether he dragged the game out for a few more fitful hours or days. Imminent exile was already an effective *fait accompli.* If he folded, he at least saved himself a few years in prison. Whether he folded or not, conviction was a virtual certainty. The guilty plea, under the circumstances, was the only smart choice to make. To try, in hindsight, to transfer his moment of meaningful choice from the crime scene forward to the trial table is simply to allow compassion to trump logic in an effort to give a forlorn defendant an essentially lawless break. The head cannot permit what the heart would like to do.

**JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.**